JODI LINKER
Federal Public Defender
Northern District of California
ELIZABETH FALK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Elizabeth_Falk@fd.org

Counsel for Defendant RODRIGUEZ FLORES

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 23–30 SI |
| Plaintiff, | **DEFENDANT'S RESPONSES TO GOVERNMENT MOTIONS IN LIMINE** |
| v. | **Court:** Courtroom 1, 17th Floor |
| MARVIN RODRIGUEZ FLORES, | **Date:** July 25, 2023, 3:30 p.m. |
| Defendant. | |

## INTRODUCTION

The government's case against Mr. Marvin Rodriguez-Flores suffers from numerous infirmities and deficiencies of a constitutional magnitude – not the least of which is that the custodial officer of the drugs is under potential career-ending investigation for impeding a criminal investigation. The case should be ended here by this Court due to substantial chain of custody and authenticity problems that render the narcotics "stash" that SFPD now attributes to Mr. Flores Rodriguez inadmissible. Government Motion in Limine No. 1 should be denied. Should the Court somehow allow this case to proceed, the Court should deny Government Motions in Limine No. 2 and 3, issue a substantial limiting instruction as to the firearm in response to Government Motion in Limine 4, exclude government expert testimony in response to Government Motion in Limine No. 5. With respect to Government Motion in Limine No. 6, the defense merely requests the same allowance that Investigator and Case Agent Michael Portman be allowed to remain in the courtroom pending testimony.

Government Motion in Limine No. 7 is *pro forma* and the defense will follow all existing caselaw with respect to that motion.

## STATEMENT OF FACTS

### I. The Search and Seizure of Narcotics Evidence in this Case is Riddled with Problems

Mr. Marvin Rodriguez Flores stands charged in Counts 2 and 3 of the Indictment with possession of over 40 grams of fentanyl with the intent to distribute (Count 2) and possession of over 50 grams of a mixture containing methamphetamine (Count 3) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). As the government concedes, the case stems from the fruits of a search warrant targeting only Mr. Olvin Isaac Gutierrez Nunez, who had made two previously recorded sales of narcotics directly to undercover officers. On the *sole basis of Nunez' conduct*, and due to the fact that SFPD officers had developed evidence that ▉ 23rd Avenue in Oakland was Nunez' residence, SFPD obtained a warrant to search that location. *See* Gov. Motions in Limine, Dkt. 91 at 2.

When the officers arrived at ▉ 23rd Avenue, they first arrested Mr. Nunez outside on his way to his car. *See* Falk Decl. Exhibit A, Police Report dated 10/13/2022 at US 575. At the apartment itself, police encountered three women – Astrith Campos-Torres, Marta Torres, and Katerin Campos-Torres, as well a 3 year old child and former co-defendant Joshua Melendez. *See id*. at 575-576. Mr.

1  Marvin Flores-Rodriguez was located dead asleep in one of the bedrooms of the unit that had been
2  rented by his girlfriend, Marta Torres. As the body camera footage reveals, searching officers were
3  very surprised to locate Mr. Rodriguez-Flores there.
4       Officers then searched various locations of the apartment and allegedly found various stashes of
5  drugs in various locations that were then attributed to various defendants – apparently based on
6  nothing other than the judgment of the searching officer. "Bedroom No. 2," for example was
7  "determined to be Nunez and Campos-Torres room," by searching officers and all the fentanyl found
8  in that room has been charged against Mr. Nunez. *Id*. at 577; see also Indictment, Count One.
9       "Bedroom No. 1," however, is far more problematic – and this is the room where officers located
10 Mr. Rodriguez-Flores. For example, with respect to former co-defendant Joshua Melendez, Officer
11 Gomez writes "inside of Bedroom #1, Officer Zografos searched the closet and located a Rugrats
12 backpack containing various narcotics, two scales, US currency, and a Honduras photo I.D.
13 belonging to Joshua Melendez." This allegation led to federal charges being filed against Melendez
14 with respect to the alleged Rugrat backpack narcotics referenced in Counts 4 and 5. Subsequent
15 review of body camera footage[1] reveals, however, that Melendez' ID **was not** found in the backpack
16 – but instead in a dresser drawer outside of the closet. *See* Falk Decl. Exhibit B, Supplemental
17 Report of Officer Gomez dated 5/3/2023. Even more suspect with respect to this search team is that
18 according to the government's Motion in Limine, the claim that any narcotics were found in the
19 Rugrats backpack at all was *false*. *See* Gov. Mot in Limine at 3:21-28. Couched as a "mistake," the
20 government writes "Officers also recovered narcotics from the closet of bedroom 1 which they
21 'mistakenly' believed came from a backpack belonging to Joshua Melendez. On further review of
22 the body worn camera, it was determined that the narcotics *did not originate in the backpack*." *Id*.
23 (emphasis added). Search warrant photographs taken at the scene, however, reveal that this search
24 team apparently *planted* the narcotics in the Rugrats backpack when "documenting" the evidence and
25 its respective locations. *See* Falk Decl. Exhibit C, Photograph of Search Warrant Execution, US-374.

---

[1] Oddly, Officer Zografos' body worn camera footage was not produced to the undersigned in discovery. The undersigned has requested a more detailed explanation of the allegations made on Page 3:21-28 of the Government's Motion in Limine. Falk Decl. Exhibit D.

1   This photograph clearly depicts the suspected narcotics originally charged against Joshua Melendez[2]
2   as located in the Rugrats backpack – a truly shocking documentation given that those suspected
3   narcotics apparently "did not originate in the backpack." *Id.*
4       These alleged "mistakes" (read, misconduct) was carried through multiple levels of the criminal
5   justice process and through multiple officers heavily involved in this case – including multiple sworn
6   affidavits and the federal criminal complaint authored by Case Agent Gomez (*See* Dkt. 1 at ¶ 25, 32
7   35); *see also* Exhibit E, Probable Cause Declaration of Officer Gomez) through to the Grand Jury
8   testimony of officer Braden Lyons. Falk Decl., Exhibit F (filed under seal). In particular, the
9   participation of Case Agent Gomez in these false representations is especially troubling given that the
10  government intends to rely entirely on Gomez to establish the chain of custody of the narcotics
11  charged against Mr. Rodriguez Flores. *See* Argument, Section I, *infra*.
12      The case against Mr. Rodriguez Flores allegedly stems from narcotics allegedly "found" in a
13  different backpack searched by Officer Blake Cunningham. Falk Decl., Exhibit A, 10/13/2022
14  Report at US 577. Per Gomez, the backpack was found "behind the TV, located on a dresser." *Id.*
15  Body camera footage reveals that white substances in plastic bags appear to have been located in a
16  backpack, along with grey running shoes. No indicia of Mr. Rodriguez-Flores was located inside the
17  backpack. Instead, inside the dresser, officers discovered the passport of Martha Torres along with
18  large amounts of cash located in a woman's pair of jeans, as well as a woman's gold Michael Kors
19  purse. Buried deep in the dresser drawer underneath women's clothing and personal items, Officer
20  Cunningham locates an Aladdin Bail Bonds folder, which the government did not retain. Of the
21  entire folder, Cunningham's sole photograph reflects a one page receipt of a bail bond paid by what
22  appears to be a woman named "Yeimy Paz Diaz" which FPD research reveals is an individual
23  connected to Martha Torres, the primary occupant of the residence. Other than this one piece of
24  paper and a key chain with a key fob to Mr. Rodriguez-Flores' car, no other indicia or other items of
25  Mr. Rodriguez-Flores were located at ▮ 23rd Avenue. Importantly, nothing ties Mr. Rodriguez
26  Flores to the backpack in which narcotics were allegedly found other than his mere presence in that
27
28  [2] Unsurprisingly, the charges against Joshua Melendez have now been dismissed.

room at that particular time.

## II. The Chain of Custody of the Alleged Narcotics Seizures Depends on an Officer Unavailable to Testify

After the various substances in plastic bags were seized, they were turned over to SFPD Officer Christina Hayes to photograph, itemize, bag, transport to the station, and store. See Falk Decl., Exhibit A at US 578 ("At the Narcotics Office, Officer Hayes weighed, field tested all seized narcotics from this incident); *see also id*. at US 578 ("Officer Hayes booked all seized narcotics at Property Control Division"); *see also id*. at US 581-582, Report of Officer Christina Hayes ("I took photos of the items located and itemized them . . . I maintained custody of all the narcotics Officer Gomez seized from this search warrant and transported them to the Narcotics office located at 850 Bryant Street. I conducted a presumptive test on the suspected narcotics . . .I sealed the suspected narcotics into a narcotics bad and booked it as evidence; I hand carried the suspected narcotics to the narcotics drop box located at 850 Bryant Street. The bag was marked with my initials and was marked bag 2 and 3." Photographs of the evidence and evidence bag reveals that Hayes herself cataloged and itemized where each particular suspected narcotic was seized (i.e., what room each suspected narcotic was allegedly seized from, and with respect to Bedroom One, which location) and who each suspected narcotic was allegedly attributed to. Photographs of the evidence produced in discovery reveal that at some point in time, the suspected narcotics at issue were individually separated, weighed, and marked by Hayes (#449) with her badge number, as well as the name of the defendant she attributed the substance to. *See* Falk Decl., Exhibit G (photographs of individually tested substances removed from original evidence seizure bags marked by Hayes with individual defendants' names). These items were then re-grouped by Hayes in particular bags that she marked with individual defendants' names. *See id.* at Exhibit H (photographs of re-bagged narcotics marked with individual defendant's names by Hayes with her officer number (#449). These markings and the bagging of particular groups of suspected narcotics together were relied on by both the Alameda County chemist who allegedly tested the substances in those particular groups, as well as the charging actions of the United States Attorney's Office in this case. *See* Falk Decl., Exhibit I (testing report of Criminalist Michelle Hensley reflecting three bags of drugs turned over for testing with

various sub-bags contained within each bag; November 15, 2022 email from Agent Gomez indicating that each bag containing sub-bags allegedly corresponded to an individual defendant.)

Officer Hayes is accordingly a central figure to the government's burden of proof on chain of custody. Officer Hayes, however, will not be called to testify by the government, having found herself in the middle of a substantial police scandal. *See* Falk Decl, Exhibit J (Lamb and Barba, *San Francisco Drug Cop Taken Off Streets, DA Drops Cases She Worked On*. The San Francisco Standard, 6/27/2023, available at https://sfstandard.com/2023/06/27/sf-police-drugs-cop-taken-off-streets-da-dismisses-cases/?utm_source=email_sitebutton (last visited July 23, 2023); *see also* Falk Decl. Exhibit K, Letter from AUSA Hillary Irvin to AFPD Falk dated July 12, 2023 documenting investigation into Hayes, including the fact that "it is alleged that Officer Christina Hayes #449 divulged confidential information and impeded an active criminal investigation involving a Confidential Informant, in violation of DGO 2,01, Rule 48 (Compromising Investigations) and Rule 49 (Divulging Confidential Information")(citing https://www.sfchronicle.com/sf/article/sfpd-drug-cases-dismissed-18173155.php) (last visited July 23, 2023).

Instead, the government purports to rely on Officer Gomez to establish the proper chain of custody in this case – the same Officer Gomez who has demonstrably false statements in numerous documents signed under penalty of perjury and presented to several judges, including Magistrate Judge Tse of this Court. *See* Criminal Complaint, Dkt. 1 at 11. Given the fact that all the individual substances located at ▮▮▮ 23rd Avenue in Oakland were removed from larger evidence bags for individual weighing and presumptive testing, it would be virtually impossible for any other officer to tell from appearance alone where any individual baggie depicted in a photograph had been located in the residence absent the markings and itemization of Officer Hayes – which are now inadmissible hearsay and must be redacted and precluded from trial if she does not testify.

**ARGUMENT**

**I. Response to Motion in Limine 1: The Court Should Not Admit the Narcotics in this Case into Evidence**

Under Federal Rule of Evidence 901, the admission of evidence purportedly connected with the commission of a crime requires the government to both "establish a connection between the proffered

DEFENDANT'S RESPONSE TO GOV. MOTIONS IN LIMINE
*RODRIGUEZ FLORES*, CR 23–30 SI
5

evidence and the defendant," (see *United States v. Tank*, 200 F.3d 627, 630 (9th Cir 2000) and "establish the chain of custody." *United States v. Harrington,* 923 F.2d 1371, 1374 (9th Cir. 1991). With respect to the chain of custody, the prosecution "must introduce sufficient proof so that a reasonable juror could find that [the evidence is] in 'substantially the same condition as when [it was] seized." *Id*. (quoting *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)). The court may admit the evidence "if there is a 'reasonable probability the article has not been changed in important respects.'" *Id*. "Factors to be considered in making this determination include the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." *Gallego*, 276 F.2d at 917.

Here, body camera evidence clearly reveals that "unavailable" witness Christina Hayes took custody of two unsealed plastic envelopes with undiscernible contents on the video (purportedly suspected narcotics and cash) and a cardboard box containing loose bags of what also appear to be narcotics when she left the scene of the search. *See* Falk Decl., Exhibit A at 581. Per the reports and video, Hayes also itemized the suspected narcotics at the scene. *Id*. She then later removed all individual drugs from various bags, opened the contents to field test them, weighed them, labeled the bags with the alleged "owner" and her badge number, re-packaged all the drugs into new bags labeled with the alleged "owner," sealed the bags, then booked all the suspected narcotics into evidence. *Id*. at 582. Her unavailability as a witness now creates a definite and significant break in the chain of custody of the narcotics seized in this case.

"A break in the chain of custody, then, can be serious enough that the district court may abuse its discretion in admitting the evidence." *United States v. Mejia*, 597 F.3d 1329, 1336 (D.C. Cir. 2010). "If there is some specifically identified risk of misidentification or alteration, the proponent of the exhibit should produce evidence to overcome this risk or suffer exclusion." *Id*. Indeed, the "presumption" of "the integrity of evidence routinely handled by government officials" "may be rebutted with a 'minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering." *Id.* at 1337 (citing *United State v. Lane*, 591 F.2d 961, 962 (D.C. Cir. 1979)).

Unlike the cases cited by the government in its Motion in Limine[3], this case demonstrates a plethora of factors that should cause the Court great concern in admitting the narcotics evidence that has been "identified" as "belonging" to Mr. Rodriguez Flores. First, the evidence's main chain of custody witness, Christina Hayes, has been indefinitely removed from active duty on the police force under allegation that, among other things, she "impeded a criminal investigation." Falk Decl., Exhibits J and K. This factor alone causes significant doubt as to the integrity of the contents of the envelopes attributed to three different defendants – not to mention the fact that Hayes' labeling of the individual drug envelopes as well as the overarching labeling of each "master envelope" to particular defendants is rendered inadmissible by her unavailability to testify. It is utterly unclear without Hayes' field test photographs how the government will be able to present evidence authenticating each narcotics exhibit and the location it was allegedly located at.

Second, the only other witness[4] the government may rely on for chain of custody purposes – SFPD officer Alexis Gomez -- suffers from significant credibility issues of her own in connection with this case, having made false statements in three affidavits to judges signed under penalty of perjury. The fact that Gomez repeatedly falsely claimed in affidavits that co-defendant Joshua Melendez's identification was located in a backpack with narcotics is not a minor issue; this allegation is likely what caused the grand jury to return an indictment against Melendez. In this vein, her word that the envelope of narcotics that was turned over to the Alameda County chemist for testing and examination are the same narcotics that were found in a different backpack in Bedroom One is suspect. Even worse, if the AUSA assigned to this case is correct that the narcotics attributed to the Rugrats backpack in Bedroom One "did not originate in the backpack" then someone on this

---

[3] For example, the government's citation to *United States v. Solorio*, 669 F.3d 943 (9th Cir. 2012) is inapposite. There, the defendant did not challenge the admissibility of the narcotics, and there did not appear to be evidence of officer misconduct, mal-intent nor misidentification or tampering/discrepancies with reports or evidence.

[44] The government's Motion in Limine suggests that "three other officers" documented the results of the search warrant and the presumptive testing of the drugs." Dkt. 91 at 6:12-13. As Exhibit A to the Falk Declaration indicates, only Officers Hayes and Gomez documented these results. *Id*. at 578-579, 580. Neither Officers Cunningham nor Puccinelli took custody of, inventoried, transported, tested, weighed, or itemized the narcotics in this case.

search team endeavored to manufacture the location of narcotics evidence by photographing suspected narcotics in that backpack. *See* Falk Decl., Exhibit D, Letter from AFPD Falk to AUSA Irvin requesting further reports and evidence surrounding the statements contained in Government's Motion in Limine at 3:25-28.

Third, contrary to the government's contention, admission of the envelopes at trial would violate Mr. Rodriguez Flores' Confrontation Clause rights. Dkt. 91 at 6:18-28. While the Alameda County chemist who tested "bags 1, 2 and 3" may be available to testify under cross examination about what certain items in those bags tested positive for, it was Hayes who marked and identified the individual drugs contained within those bags as being attributed to particular defendants and as discovered in certain locations in the residence. Falk Decl., Exhibits G and H (photographs of individual bags of evidence and master bags of evidence marked as attributed to particular defendants by Officer Hayes). SFPD Gomez then relied on those markings by Hayes on the bags to connect the Alameda County chemists' findings to individual defendants in this case, and would do so again were she to testify in this case. Falk Decl. Exhibit I (email from Agent Gomez to AUSA Irvin explaining chemist results). Without Officer Hayes, Mr. Rodriguez Flores has lost the ability to cross examine the very person who itemized, organized, photographed, tested, weighed and then booked narcotics into evidence that are supposedly located in a particular place and attributed to him, as opposed to another co-defendant. In other words, Gomez' identification of these bags in connection with individual defendants solely and entirely depends on the markings and booking procedure conducted by Hayes, and she cannot be fairly cross examined on Hayes' markings. Confrontation as to the location and attribution of particular drugs to particular defendants would accordingly be denied were the Court to allow Gomez to testify from Hayes' markings that the drugs located in Bags 1, 2 and 3 are attributed to specific defendants.

All told, the seizure, storage, custody, control, itemization, and attributing of particular narcotics evidence in this case to individualized defendants is, at minimum, troubling. The absence of custodial officer Hayes at this trial, coupled with the other serious infirmities in the evidence chain and the false statements of officers documented above renders the narcotics evidence in this particular case inadmissible against Mr. Rodriguez Flores. The Court should exclude the narcotics

evidence proffered as "belonging" to Mr. Rodriguez Flores.

**II.  Government Motion in Limine No. 2: The Court Should Deny this Motion Because there is No Evidence Hayes is Available as a Witness for the Defense to Call, no *Giglio* or *Brady* Evidence has Yet to be Produced, and the Court Does Not Know the Nature of Hayes' Misconduct.**

Government's Motion in Limine No. 2 seeks to preclude the defense from using unknown, yet-to-be-produced *Brady* and *Giglio* material against Officer Hayes should she be subjected to cross examination.  This motion is grossly premature and cannot possibly be adjudicated by the Court at this juncture, given (1) the defense does not yet know if Officer Hayes will be made available to testify as a defense witness (*see* Falk Decl., at ¶ 13 ); (2) the actual *Brady/Giglio* material related to Officer Hayes' alleged misconduct has not yet been produced, but should be today under this Court's scheduling Order; (3) the Court cannot possibly rule on the relevance or materiality of that *Brady/Giglio* material unless and until the Court reviews it.  The government's motion accordingly cannot be ruled on at this juncture and may be moot, depending on the results of the defense's subpoena.

As a threshold and central issue to this ruling, however, the government is incorrect that the Court should limit the scope of potential cross-examination of Officer Hayes in a vacuum.  The allegations against Officer Hayes are serious and are not the run-of-the-mill un-sustained citizen complaints of conduct unbecoming an officer.  The allegations indicate that Officer Hayes is accused of *impeding an active criminal investigation*, which are allegations of dishonesty and unfair dealing that cut against the entire cloth of her professional responsibilities including the responsibilities she undertook in this case.  Because the potential issues go the heart of Officer Hayes' credibility and veracity, the Court can and should allow extrinsic evidence to be introduced for this purpose.  See, e.g., *Gregory v. City of Vallejo*, 2015 U.S. Dist. LEXIS 7475 (E.D. Cal. 2015) at *3 (citing cases that allow for cross examination of witnesses as to specific instances of conduct that are probative as to that witness' credibility or character for truthfulness).

The defense accordingly requests the Court to defer any ruling on this issue unless and until it becomes ripe for adjudication.

**III. Government's Motion in Limine 3 Should be Denied, as Mr. Rodriguez Flores Does Not Yet have any 404(b) Notice from the Government and any Such Notice is Now Too Late for Adjudication – and the Government's Motion Itself Does Not Contain Any Specific Allegations of Conduct that Could be Admitted Under the Rule.**

In its Motion in Limine No. 3, the government seeks carte blanche approval to admit "evidence of drug trafficking" against Mr. Rodriguez Flores, without any more specification than "as recently as the day before the execution of the search warrant, both Nunez and Cruz Medina were seen by SFPD officers dealing fentanyl in the Tenderloin." Dkt. 91 at 10: 9-11. In addition to the fact that no police report whatsoever[5] documents this allegation, the sheer lack of notice to either the defendant or the Court about the actual extrinsic evidence the government seeks to admit merits' this Court's order precluding the use of all such evidence.

Federal Rule of Evidence 404 prohibits admitting character evidence and other acts subject only to *specific and narrow* exceptions. Rule 404(a)(1) states that, "[e]vidence of a person's character . . . is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). "Rule 404(b) forbids the admission of evidence of 'other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith.'" *United States v. Verduzco*, 373 F.3d 1022, 1026 (9th Cir. 2004) (quoting Fed. R. Evid. 404(b)). These prohibitions reflect the "concern that a person charged with a crime be convicted only if its elements are proved beyond a reasonable doubt" and not "merely because he or she has done prior bad acts." *United States v. Martin*, 796 F.3d 1101, 1105 (9th Cir. 2015). As a default position, the court should presume that the government's alleged "evidence" of Mr. Rodriguez Flores' alleged "prior drug dealing activity" is pure propensity evidence. "Rule 404(b) provides that evidence of 'other crimes, wrongs, or acts' is inadmissible to prove character or criminal propensity." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011). Other acts evidence "*may* be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2) (emphasis added). The government

---

[5] In his Search Warrant Incident Report dated 10/13/22, Officer Cunningham does make a reference to having seen a person he claims was Mr. Rodriguez Flores "walking East on Golden Gate Avenue into the Tenderloin." However, at no point does Officer Cunningham claim to have seen Mr. Rodriguez Flores *selling drugs* on that day. Falk Decl., Exhibit A at 580.

bears the burden of establishing an adequate factual and legal basis for admission of 404(b) evidence. See *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982)(citing 2 J. Weinstein and M. Berger, *Weinstein's Evidence,* 404 at 404-49 (1981)).

Because the risk of admitting 404(b) "other acts" evidence is so great, and so potentially risky that a jury will convict a defendant because of a belief about "who he is" versus whether he committed the charge act, Rule 404(b) requires the government give "reasonable notice" before trial "of the general nature of any such evidence that the prosecutor intends to offer at trial" before it may be admitted. Fed. R. Evid. 404(b)(2).[1] Notice is "designed to reduce surprise and promote early resolution of admissibility issues." *United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999). Without adequate notice, it is impossible to "make the focused determination of relevance mandated" by Rule 404(b). *United States v. Mayans*, 17 F.3d 1174, 1183 (9th Cir. 1994). Failure to provide adequate notice "renders the other acts evidence inadmissible, whether the evidence is used in the prosecution's case-in-chief or for impeachment." *Vega*, 188 F.3d at 1153.

The government must "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *Mehrmanesh*, 689 F.2d at 830. The "incantation of the proper uses of such evidence under the rules does not magically transform inadmissible evidence into admissible evidence." *United States v. Morley*, 199 F.3d 129, 133 (3rd Cir. 1999). The law sets this high bar because it is error for a district court to admit evidence that "has no legitimate relationship to the crimes charged," and is "strongly suggestive of a criminal disposition . . . and a propensity to commit . . . the very offenses charged in the indictment." *United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009) (quotations and citations omitted).

Here, the government's Motion in Limine seeks broad license to admit unnamed, undated, and Unnoticed "evidence concerning the observed drug trafficking activities of both defendants." Dkt. 91 at 10:4. As to Mr. Cruz Medina, the government does not bother to tell the Court what these supposed "observed drug trafficking activities are" other than suggest that Officer Cunningham will testify (contrary to his report) that he observed Mr. Rodriguez Flores sell drugs on October 12, 2023. This blanket request is far too vague and unspecific to allow the Court to conclude that "observed drug trafficking activities" are inextricably intertwined with the seizure of narcotics in Oakland on October

13, 2023 – much less meet 404(b)'s stringent standard.  In sum, the government has not at all "articulate[d] precisely the evidential hypothesis" nor explained how such evidence is anything other than pure propensity evidence.  *Mehrmanesh*, 689 F.2d at 830.

Without such notice or articulation of individualized events, the Court cannot make a reasoned assessment under Rule 404(b)'s four part test: "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *Verduzco*, 373 F.3d at 1027.  Nor can this Court conduct the requisite balancing test under Federal Rule of Evidence 403 and determine if the danger of unfair prejudice from the evidence outweighs its probative value. *United States v. Ramirez-Robles*, 386 F.3d 1234, 1243 (9th Cir. 2004).

In sum, the government's attempt to introduce other-acts evidence in this case is sorely lacking in detail and notice, putting this Court in an impossible position as to fair adjudication.  Given the timing of the trial and the fact that the government had well over a week to put together a specific notice once the trial date was announced, this Court should exclude all other-acts evidence as untimely and unduly prejudicial given the defense's lack of opportunity to investigate any potential "other acts" evidence at this juncture.  The fair result is exclusion of all "other acts" evidence at trial.

### IV. Government Motion in Limine 4: The Court Must Issue a Limiting Instruction Precluding the Jury from Considering the Firearm Located at Nunez' Residence Against Mr. Rodriguez Flores.

In its Motion in Limine 4, the government seeks to admit evidence of a firearm located at Nunez' residence in Oakland as evidence of drug trafficking.  Although it is not clear whether or not the government seeks to use such evidence against Mr. Rodriguez Flores in particular, to the extent it does so the Court should exclude the firearm as far more prejudicial to Mr. Rodriguez Flores than it is probative.

As a threshold matter, there is zero connection between Mr. Rodriguez Flores and the firearm.  He has been excluded as a DNA contributor to the firearm and no ammunition was located on his person, in his vehicle, or anywhere near where he was found in the residence.  There is also no physical connection between the firearm and the narcotics located in the house.  Body camera footage

reveals that the firearm in question was located hidden behind nailed-down fence boards outside the residence; not near where any narcotics were found in the house. Nor is there convincing evidence that Mr. Rodriguez Flores *even resided* at the searched residence where the firearm was found other than his presence at the time the warrant was executed. These factors in combination suggest that the firearm has very little probative value as to Mr. Rodriguez Flores because there is zero nexus between him and the firearm, much less any nexus between the firearm and any alleged drug trafficking on his part.

The FRE 403 balancing test the Court must conduct as to Mr. Rodriguez Flores is clear; testimony about the firearm (particularly alleged expert testimony loosely referred to in the government's Motion in Limine at 11:16-21) is incredibly prejudicial, and given the lack of nexus to both the drugs at issue in this case and him personally, is not at all probative. The Court should exclude evidence of the firearm from this trial. Should the Court decide to admit the firearm, Mr. Rodriguez Flores reserves his right to request a severance or a limiting instruction from the Court.

**V. Government Motion in Limine 5: The Court Should Afford the Government the Very Remedy it Seeks and Exclude All Expert Testimony from the Trial due to Lack of Notice.**

The government seeks an order precluding the defendant from admitting expert testimony due to lack of requisite notice under FRCP 16. The defense agrees. Neither side should be permitted to call an expert witness at this point, given that the requisite notice under Rule 16 would be far too late into the trial process for either side to effectively respond. To date, the defense has not received any expert notice from the government. *See* Falk Decl. at ¶ 14. The Court should grant the government's motion as to expert witnesses on both sides of this case.

**VI. Government Motion in Limine 6: The Court Should Allow the Defense to Designate FPD Investigator Michael Portman as the Case Agent and Permit Him to Remain in the Courtroom; Otherwise, this Motion is Unopposed**

Mr. Rodriguez Flores has no objection to the Government's Sixth Motion in Limine seeking sequestration of all witnesses other than designated case agents. The defense solely requests the Court to grant a case agent exception for FPD Investigator Michael Portman in the same manner as the government requests; to allow him to remain inside the courtroom during testimony.

Mr. Rodriguez Flores additionally requests the Court to designate all noticed government

witnesses as further under defense subpoena, to the extent the government decides not to call certain individuals on its current Witness List. The defense will work with the government over the next week to ensure that all witnesses on the government's list have been subpoenaed and fill in any gaps in subpoenas as necessary.

**VII. Government Motion in Limine 7**

Government's motion in limine 7 reflects a request for the defense to follow governing Ninth Circuit law, which the defense fully intends to do.

**CONCLUSION**

For the aforementioned reasons, Mr. Marvin Rodriguez Flores requests the Court to deny government's Motions in Limine 1 and 3-4, grant Motion in Limine 5 as it relates to both sides' expert disclosures and the presentation of expert testimony, deny Motion in Limine 5 as it relates to defense evidence not reasonably obtainable earlier, and defer ruling on Motion in Limine 2 until there is more information before the Court. The Court should allow FPD Investigator Michael Portman to remain in the courtroom during trial as the case agent for the defense (in response to Government MIL 6). The remainder of the government's motions are pro forma.

Dated:   October 21, 2020                    Respectfully submitted,

                                             JODI LINKER
                                             Federal Public Defender
                                             Northern District of California

                                                      /S
                                             ─────────────────────────
                                             ELIZABETH FALK
                                             Assistant Federal Public Defender